IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 11, 2003

## RODRICK JOHNSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 98-A-87     J. Randall Wyatt, Jr., Judge**

---

**No. M2002-01212-CCA-R3-PC - Filed September 2, 2003**

---

The petitioner, Rodrick Johnson, appeals the denial of his petition for post-conviction relief, asserting that: (1) the post-conviction court erred by failing to make findings and conclusions as to each issue; (2) the jury instructions provided by the trial court lowered the State's burden of proof; (3) the trial court erred in not instructing as to the lesser-included offense of facilitation; and (4) he was denied the effective assistance of counsel on appeal. We affirm the order of the post-conviction court dismissing the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOE G. RILEY, J., joined.

Rodrick Johnson, Only, Tennessee, Pro Se (on appeal), and Ellsworth D. Ware, III, Nashville, Tennessee (at trial), for the appellant, Rodrick Johnson.

Paul G. Summers, Attorney General & Reporter; Thomas E. Williams, III, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dan Hamm, Assistant District Attorney General, for the appellee, the State of Tennessee.

### OPINION

In November of 1998, the petitioner was convicted of second degree murder and sentenced to confinement for twenty-one years. This court affirmed the conviction on direct appeal. See State v. Roderick Johnson,[1] No. M1999-00605-CCA-R3-CD, 2000 WL 1717542, at *4 (Tenn. Crim. App. Nov. 17, 2000), perm. to appeal denied, (Tenn. Apr. 24, 2001). The conviction resulted from the stabbing death of William Edwin Binkley, as the opinion of this court set out on direct appeal:

---

[1]We note the petitioner utilizes a different spelling of his first name in his post-conviction petition from that used in the direct appeal.

On October 24, 1997, between 8:30 and 9:00 p.m., Derrick and Amanda Barrett returned home from an evening of shopping. They passed a vehicle parked in the apartment complex's parking lot with its windows rolled down, and they noticed an African-American infant restrained in an infant seat in the vehicle's back seat. After approximately 30 minutes passed, they grew concerned for the infant's well-being, and Derrick Barrett wrote down the vehicle's license plate number. Amanda Barrett phoned 911 to report the abandoned child. Subsequent to Amanda Barrett's phone call to 911, Derrick Barrett witnessed two African-American males run out of an apartment, get into the vehicle, and drive away. The police checked the license number that Derrick Barrett copied and determined [the petitioner] to be the owner of the vehicle.

While [the petitioner's] vehicle was in the parking lot, numerous witnesses testified as to a commotion occurring in [the victim's] second floor apartment. Witnesses reported hearing the sounds of threats, pleading, and fighting for approximately an hour. One witness heard someone yell, "where's my money?" Another witness heard someone say, "where's the dope?" Although several residents phoned 911 throughout the ordeal, they were told that officers were not available. Accordingly, a resident phoned the victim's mother, Francis Hampton, and informed her that her son was in peril. Hampton arrived within 10 minutes of the phone call, knocked on the victim's locked door, and demanded entry. She walked back down the steps to meet the apartment manager to procure a key to the victim's door. Suddenly, two African-American males exited the victim's apartment, walked directly by her on the steps, and ran to their vehicle. At trial, Hampton identified [the petitioner's] brother, the co-defendant, but was unable to identify the other male because he wore a hat down over his face.

Hampton entered the victim's apartment and found him lying on the floor in a pool of his own blood. He was transported to Vanderbilt Hospital by emergency personnel and died three days later. It was subsequently determined that his death resulted from being beaten and stabbed 41 times.

Id. at *1.

Initially, we note that the petitioner did not file a notice of appeal within the statutory limitations period. See Tenn. R. App. P. 4(a). Tennessee Rule of Appellate Procedure 4(a) requires that a notice of appeal must "be filed with and received by the clerk of the trial court within 30 days

after the date of entry of the judgment appealed from." The deadline for the filing of the notice of appeal was March 28, 2002, and the petitioner filed his notice of appeal on May 2, 2002. The timely filing of a notice of appeal is not, however, a prerequisite to the jurisdiction of this court. The requirement may be waived in the interest of justice. Id.; State v. Scales, 767 S.W.2d 157, 158 (Tenn. 1989). Here, the record establishes that the attorney who was appointed to represent the petitioner in the post-conviction court did not file either a notice of appeal or a motion to withdraw as counsel after the dismissal of the petition by the post-conviction court. See Tenn. Sup. Ct. R. 13, § 1(i). The petitioner asserts that he filed a *pro se* notice of appeal immediately upon learning that the dismissal of his petition had not been appealed. Under these circumstances, we conclude that the interest of justice requires that the timely filing of the notice of appeal be waived.

## I. Completeness of Findings and Conclusions by the Post-Conviction Court

The petitioner's first claim on appeal is that the trial court did not make findings of fact and conclusions of law as to each issue raised; and, therefore, this court should reverse the order of dismissal of the post-conviction petition and remand for a determination as to each issue. In reviewing this issue, we first will set out the complicated course of this matter through both post-conviction hearings and the difficulty in identifying exactly which issues were to be determined by the court.

### *Pro Se* Petition

The *pro se* petition for post-conviction relief, bearing a clerk's stamp of May 7, 2001, set out the following claims, which we denominate as did the petitioner.

Ground I – Ineffective Assistance of Counsel

Trial counsel was ineffective by failing to: (A) seek a mistrial because of introduction of a "dying declaration" of the victim; (B) request an instruction as to the weight to be given such a declaration; (C) raise in the motion for new trial or on appeal the court's failure to properly instruct as to the declaration; (D) raise in the motion for new trial or on appeal that the instructions as to the burden of proof were misleading; (E) object to or raise in the motion for new trial or on appeal that the trial court's instruction as to criminal responsibility was erroneous; and (F) object to or raise in the motion for new trial or on appeal that the trial court allowed "irrelevant and prejudicial blood evidence to be introduced in trial."

Ground II – Trial Court Errors as to Instructions Given

The petitioner was denied a fair trial because of an erroneous "burden of proof" jury instruction and an erroneous criminal responsibility instruction, the latter having the effect of directing a verdict against him.

Ground III – Trial Court Errors as to Instructions Not Given

The trial court failed to instruct the jury as to facilitation and "all lesser included offenses."

### First Amended Petition Filed by Appointed Counsel

Appointed counsel filed an amended petition for post-conviction relief on July 12, 2001, claiming that the trial court erred (1) by admitting the victim's statement to his mother as a dying declaration; (2) by "over-reliance" upon circumstantial evidence; (3) by refusing to instruct as to facilitation of felony murder; and (4) in sentencing the petitioner to twenty-one years. Thus, all errors raised by post-conviction counsel in the amended petition were as to actions or inactions by the trial court. No claims were made in the first amended petition as to ineffective assistance of counsel.

### First Evidentiary Hearing

At an evidentiary hearing on September 19, 2001, at which trial counsel testified, the petitioner stated to the post-conviction court that he did not agree with the issues his appointed post-conviction counsel had presented in the amended petition and had wished to retain the claims of ineffective assistance of counsel, set out as Grounds I and III in the *pro se* petition, as well as "another ground . . . about the jury instruction." The post-conviction court continued the matter to allow the petitioner and post-conviction counsel to work out which issues were to be argued, advising the petitioner that the claims set out in his *pro se* petition had not been waived.

### Second Amended Petition Filed by Counsel

The record on appeal does not include a copy of this pleading, which is described by the petitioner, in a subsequent *pro se* motion filed in January 2002, as having raised only "the claim of ineffective assistance of counsel."

### *Pro Se* Motion to Preserve Claims

After the first evidentiary hearing and apparently because of dissatisfaction with counsel's second amended petition, the petitioner filed a *pro se* motion in January 2002 asking that "Grounds II and III" of his *pro se* post-conviction petition be preserved. Thus, the status of the contentions at that point appeared to be that the claims of ineffective assistance of counsel raised in the *pro se* petition had been replaced by those set out in counsel's second amended petition, and that Grounds II and III, which the petitioner himself first had raised, still were being pressed.

### Second Evidentiary Hearing

On February 6, 2002, a second evidentiary hearing was held, with both trial counsel and the petitioner testifying. At the hearing, post-conviction counsel questioned trial counsel and both he

and the petitioner argued the claims set out in the various post-conviction pleadings. Subsequently, in this opinion, we will set out the testimony and arguments.

As his first issue on appeal, the petitioner argues that the trial court made findings of fact and conclusions of law only as to the claims of ineffective assistance of counsel, but not as to the additional claims he had raised in the original *pro se* petition. Thus, according to the petitioner's argument, the order dismissing the post-conviction petition should be reversed and the matter remanded for findings and conclusions as to all issues.

As we understand the various pleadings and the arguments at the post-conviction hearings, there was substantial overlap of the petitioner's arguments and those of post-conviction counsel. The petitioner's complaints, set out as Grounds II and III in his *pro se* petition, were alleged errors of the trial court, that the court erred in its instructions by use of the phrase, "or either of them," when instructing as to second degree murder; in its instructions as to criminal responsibility; and in not instructing the jury as to facilitation. The ineffective assistance of counsel complaints, made by post-conviction counsel in the second amended petition, and as explained by the petitioner in his brief, were that trial counsel was ineffective by not raising as issues on appeal that the trial court erred both in concluding that the victim's statement to his mother was a dying declaration and by not instructing the jury as to facilitation. In its findings of fact and conclusions of law, the post-conviction court expressed the primary issues as being that appellate counsel was ineffective in not raising the claims that the trial court erred in its instructions to separately consider "the culpability of each defendant" and by not instructing as to facilitation. As to the two claims, the post-conviction court determined in its written findings and conclusions that trial counsel was not ineffective as to these matters but did not determine whether the court itself, then acting as the trial court, erred as to the same matters. Additionally, the post-conviction court stated in its findings that other claims raised in the various pre-hearing pleadings filed by the petitioner and his counsel, including admission of the victim's statement as a dying declaration, "over reliance by the jury on circumstantial evidence," and the propriety of the petitioner's sentence, "were not emphasized or argued at the hearing." The court determined that the "petitioner's remaining claims which are raised in his petitions are without merit."

The responsibility of the post-conviction court as to making written findings and conclusions is set out in Tennessee Code Annotated section 40-30-211(b), which provides:

> Upon the final disposition of every petition, the court shall enter a final order, and except where proceedings for delayed appeal are allowed, shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each such ground.

The petitioner argues that the post-conviction court did not make findings as to Grounds II and III, which he had raised in his *pro se* petition, these being, as we have stated, that the trial court had erred in its jury instructions as to its use of the phrase "or either of them;" in its charge as to

criminal responsibility; and in not instructing as to facilitation. While it is correct that the post-conviction court did not make express findings and conclusions as to the specific claims set out in Grounds II and III, it was not entirely clear, as we view the post-conviction hearings, that the petitioner intended that some of the same claims be presented as both errors of the trial court and of appellate counsel. We note that the post-conviction court did rule on the claims of error in the instructions to the jury. However, this was done in the context of whether trial counsel was ineffective and not as to whether the trial court also had erred in this regard.

This court determined, in State v. Swanson, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984), that "the failure of the trial judge to abide by the requirement does not always mandate a reversal of the trial court's judgment." In fact, since the purpose of the requirement for written findings and conclusions as to each issue is to facilitate appellate review of the post-conviction court's decision, reversal is not required even though the trial court did not so rule when the record is otherwise adequate for review. In the present appeal, the issues which the petitioner argues that the post-conviction court did not consider are matters as to which the record is sufficient for this court to make determinations. Accordingly, we respectfully disagree that this matter must be remanded for additional findings and conclusions by the post-conviction court, and now will consider the remaining issues raised on appeal.

## II. Jury Instructions

The petitioner argues that the trial court erred in its instructions as to second degree murder and criminal responsibility, thus denying his "right to a fair trial by lowering the State's burden needed to convict." The specific complaint as to the instructions for second degree murder is the use of the phrase, "or either of them," as in the sentence "[f]or you to find the defendants, or either of them, guilty of this offense, the State must have proven beyond a reasonable doubt . . . that the defendants, or either of them, unlawfully killed the alleged victim; and [] that the defendants, or either of them, acted intentionally[.]"

As to this claim, the post-conviction court concluded that "the jury instruction regarding the jury giving separate consideration to each defendant fairly directs the jury to consider each defendant on the facts and circumstances that apply to that particular defendant," and that "[t]he verdict obviously indicates that the jury, in fact, followed the Court's instruction and returned different verdicts as to each defendant."

The petitioner's argument includes no authorities agreeing with his interpretation of this language. In fact, his parsing of the instructions ignores several matters. First, the instructions as to first degree murder concluded with the same language which the petitioner criticizes as to the instruction for second degree murder, that if the jury found the defendants, "or either of them," not guilty of first degree murder, or had "a reasonable doubt as to the guilt of either of the defendants as to this offense," the jury was to "acquit that defendant of this offense" and consider "that defendant's guilt or innocence of second degree murder[.]" Obviously, the jury heeded this instruction, for it convicted the petitioner of second degree murder, although convicting his

codefendant of first degree murder. While the petitioner acknowledges that the trial court instructed the jury that it was to "give separate consideration as to each defendant," he argues that "[t]his instruction was not only inconsistent with, but nullified by, the court's repeated use of the phrase 'or either of them' throughout the instructions when defining the State's requisite burden of proof needed to convict." We respectfully disagree with this argument, which we believe to be pure speculation. Jury instructions must be reviewed in the context of the overall charge rather than in isolation, as the petitioner has done. See Sandstrom v. Montana, 442 U.S. 510, 527, 99 S. Ct. 2450, 2461 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). The instructions of which the petitioner complains do neither.

It is clear from the differing verdicts that the jury gave separate consideration to the charges against each defendant. Accordingly, we conclude that the record fully supports the determination of the trial court that this claim is without merit.

Additionally, the petitioner argues that the instructions as to criminal responsibility were erroneous. He asserts that the phrase, a defendant is criminally responsible for an offense committed by another if, with intent to promote or assist the offense, he "solicits, directs, aids or attempts to aid another person to commit the offense," is inconsistent with and nullifies the instruction that before a jury can find a defendant criminally responsible it first must determine "that all of the essential elements of said offense [have] been proven beyond a reasonable doubt." According to the petitioner's analysis, as we understand it, the result of these instructions was that the State was required to prove only the essential elements of the offense but not that the petitioner acted with the intent to promote or assist the offense.

Again, the petitioner has cited no authorities which support this argument. We believe that a commonsense reading of this instruction simply is that a defendant cannot be criminally responsible for an offense committed by another unless the State first has proven beyond a reasonable doubt the elements of the offense. If the jury determines that the defendant, acting to promote or assist in the commission of the offense, or to benefit in its proceeds or results, solicited, directed, aided, or attempted to aid another to commit the offense, then the defendant is criminally responsible for the offense. We respectfully disagree with the claims that the language is contradictory or confusing. Accordingly, we concur with the determination of the post-conviction court that this claim is without merit.

### III. Ineffective Assistance of Counsel

In his remaining claim, the petitioner asserts that he was denied the effective assistance of counsel on appeal, because counsel did not raise as issues on appeal: (1) the trial court's erroneous admission of the victim's dying declaration to his mother and (2) the trial court's failure to provide

a jury instruction on the lesser-included offense of facilitation of first degree murder.[2] The State asserts that because neither issue would have been meritorious, counsel was not ineffective for failing to present them on direct appeal.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable

---

[2] For the purposes of our review, we are combining the claim, raised as Ground III in the *pro se* post-conviction petition, that the trial court erred in not instructing as to facilitation and, in the second amended petition, that appellate counsel was ineffective for not raising this issue on direct appeal.

considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

By statute in Tennessee, the petitioner at a post-conviction relief hearing has the burden of proving the allegations of fact by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f) (1997). We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999), "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

## A. Dying Declaration

As to the victim's "dying declaration," counsel, who represented the petitioner both at trial and on appeal, testified that he had practiced law for over thirty years and had tried "several hundred" murder cases at the time of the petitioner's trial. He said that although he could not recall who had actually entered the objection, either he or counsel for the codefendant had objected at trial when the State tried to introduce through witness Francis Hampton, the victim's mother, a statement made by the victim shortly before his death. He recalled that Ms. Hampton testified that when she asked the victim what had happened in the apartment, the victim replied, "I didn't owe them any money." Counsel believed that the trial court had correctly ruled that the statement was admissible under the dying declaration exception to the hearsay rule and that, in context, the testimony was not particularly damaging to the petitioner. Counsel explained that the victim's statement did not in any way identify the petitioner, and no evidence was offered at trial that the victim owed the petitioner money. He recalled that the codefendant testified at trial that the victim owed him money. Counsel stated that he chose not to raise the issue on direct appeal because he "tried to only raise issues that [he] thought had some degree of being successful. . . . [and he] felt that it was not a valid issue."

We have reviewed the trial transcript and note that counsel for both the petitioner and his codefendant objected to the statement of the victim to his mother, "Momma, I didn't owe them any money. I didn't owe them any money," arguing that it was not a dying declaration. However, the trial court ruled that this statement was admissible as a dying declaration. Trial counsel for Robert Johnson, the codefendant, raised the issue on direct appeal, but this court agreed with the trial court's determination that the statement was a dying declaration:

> Given the facts, [the victim's] belief that his death was imminent can be readily inferred. Since the evidence supports the trial court's conclusion that the victim was aware of his impending death at the time he made the statement to his mother, we cannot say that the evidence preponderates against the trial court's conclusion that [the victim's] statement was a dying declaration. Hence, it was admissible under the hearsay exception for dying declaration, Tenn. R. Evid. 804(b)(2), and the trial court did not err. Defendant is not entitled to relief on this issue.

State v. Robert Earl Johnson, No. M2000-01647-CCA-R3-CD, 2001 WL 1180524, at *12 (Tenn. Crim. App. Oct. 8, 2001), perm. to appeal denied (Tenn. Apr. 1, 2002).

As to this claim, the post-conviction court determined that trial counsel properly exercised his discretion in deciding that the "dying declaration" claim would have been unsuccessful on appeal, and that he should raise only those issues which he believed might be successful. We agree and conclude that the petitioner failed to establish that he was prejudiced by the fact trial counsel did not raise on direct appeal a claim which was without merit.

-10-

## B. Jury Instruction as to Facilitation

As to the petitioner's second allegation, counsel testified that while he could not specifically recall requesting an instruction on facilitation, it was his standard practice to make such a request when the crime involved more than one participant and where his client was charged under a criminal responsibility theory. Counsel, who relied on an alibi defense at trial, stated that he did not raise as an issue on direct appeal the fact that the trial court had not instructed the jury as to facilitation because "in looking back on the facts of this case . . . it would have almost been . . . frivolous." He did, however, acknowledge that he "could have overlooked it as a matter of oversight. But . . . I didn't leave the [c]ourtroom thinking that there had been an error made by [the trial court] charging or refusing to charge facilitation." It was his opinion that the petitioner "was extremely fortunate in receiving second degree murder rather than first degree murder."

The post-conviction court denied relief as to this claim in a general manner, finding that counsel was not ineffective but was "a very experienced and competent trial attorney whose representation of [the petitioner] was well within the range of competence demanded of criminal defense attorneys." Further, the post-conviction court accredited the testimony that the petitioner "was very fortunate to not be convicted of first degree murder under the facts of this case."

The trial and appeal of this matter straddled the decision of our supreme court in State v. Burns, 6 S.W.3d 453 (Tenn. 1999), the trial occurring in 1999 before the release of Burns and appellate counsel filing the petitioner's brief on direct appeal after its release. The court explained in Burns "that facilitation [is] a lesser-included offense of criminal responsibility for first-degree murder." Id. at 470. While the jury at the petitioner's trial was instructed as to criminal responsibility, it was not instructed as to facilitation.

Our supreme court explained in State v. Moore, 77 S.W.3d 132, 134 (Tenn. 2002), the responsibility of the trial court to instruct as to lesser-included offenses and the process to utilize in determining which such offenses must be in the charge to the jury:

> [I]t is the duty of the trial judge to instruct the jury as to the law of a lesser-included offense if he or she determines that: (1) reasonable minds could accept the offense as lesser-included; and (2) the evidence is legally sufficient to support a conviction for the lesser-included offense. State v. Burns, 6 S.W.3d 453, 469 (Tenn. 1999). The judge shall instruct the jury on all lesser-included offenses notwithstanding a request from the defendant. Tenn. Code Ann. § 40-18-110(b) (1997 Repl.).

Id. (footnote omitted).

The question of whether a given offense should be submitted to the jury as a lesser-included offense is a mixed question of law and fact. State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001) (citing

-11-

<u>State v. Smiley</u>, 38 S.W.3d 521 (Tenn. 2001)). The standard of review for mixed questions of law and fact is *de novo* with no presumption of correctness. <u>Id.</u>; <u>see also</u> <u>Burns</u>, 6 S.W.3d at 461.

Tennessee Code Annotated section 39-11-403(a) provides, in relevant part, as to criminal responsibility for facilitation of a felony:

> A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

Our supreme court explained, in <u>State v. Allen</u>, 69 S.W.3d 181 (Tenn. 2002), that reversible error occurred from the jury's not having been instructed as to facilitation because, based on the evidence, the jury reasonably could have determined that the defendant was guilty of this offense:

> The proof in this case showed that Allen stood silently in the doorway of the market as his accomplice robbed the clerk at gunpoint. Allen displayed no weapon and took no property from the victim. There was no evidence that he received any proceeds of the robbery. The jury could have reasonably concluded that Allen did not share the intent of his accomplice even though he knowingly furnished substantial assistance by blocking the door. Furthermore, consistent with the general rule, the proof of aggravated robbery in this case necessarily proved robbery. Therefore, evidence existed that reasonable minds could accept as to the offense of facilitation of robbery.

<u>Id.</u> at 188 (footnote omitted).

Likewise, in <u>State v. Richmond</u>, 90 S.W.3d 648 (Tenn. 2002), the court explained that overwhelming proof as to the greater offense does not obviate the necessity to instruct as to lesser offenses:

> [O]verwhelming evidence established defendant Richmond's participation in the robbery of Mose Cuxart and attempted robbery of Charles Stephen Earls. Likewise, evidence was overwhelming and uncontroverted that deadly weapons were involved. In proving the greater offenses, the State necessarily proved the lesser-included offenses. Therefore, a jury *could* have convicted the defendant of the lesser-included offenses of robbery and attempted robbery. As such, it was error for the trial court not to charge the lesser-included offenses of robbery and attempted robbery.

Id. at 662-63.

However, the court additionally explained that the fact that lesser offenses should have been charged, but were not, does not necessarily require a reversal of the conviction:

> [O]ur determination whether this error was harmless beyond a reasonable doubt hinges upon what a reasonable jury *would* have done in light of the evidence produced at trial. We hold that no reasonable jury would have convicted the defendant on the lesser-included offenses of robbery and attempted robbery instead of the charged offenses due to the uncontroverted and overwhelming evidence establishing the use of deadly weapons and his direct participation in the offenses. Any error was harmless beyond a reasonable doubt.

Id. at 663.

To assess the petitioner's claim in the present appeal that his conviction should be reversed because the court did not instruct as to facilitation and appellate counsel did not raise this as an issue on appeal, we will review the evidence.

Christopher Michael Darnell, the victim's next-door neighbor at the apartment complex, testified that on October 24, 1997, the day of the crime, he heard a knock on the door, looked outside, and saw two men first standing in front of the victim's apartment and then going inside. He continued, "And after that, all chaos broke loose. There was yelling and all types of commotion and fighting." Darnell described what happened next:

> A lot of fighting, stuff breaking, a lot of throwing around, yelling. [The victim] was almost thrown – thrown through my wall, numerous times. All through this, I just keep hearing, "Where's my money? I want my money."

Darnell said that the demands for money were "[f]rom the other individuals," not from the victim. He estimated that the commotion lasted for "approximately an hour." When he and his wife heard someone say, "I'm going to shoot you," they got into a corner behind some furniture. He said that "after all the fighting and stuff got done," the two men stayed in the victim's apartment for fifteen to twenty minutes. Heather Darnell testified that she heard the men "asking where their money was, and that if he didn't give them their money, they were going to shoot him."

Vickie Miller, another of the victim's neighbors, said that, on the evening of the crime, she had been in her apartment with her sister and grandchild. About 9:30 p.m., she saw two African-American men in the yard in front of her apartment. The men then went up the stairs to two apartments, one of which was the victim's. Her mother, who lived in the apartment just below that

of the victim, called and asked her to come. While at her mother's apartment, Miller "heard [the victim] screaming for his life," saying, "Oh, God, help me. They're killing me. Oh, God, help me." She arrived at her mother's apartment at 9:55 p.m. and "kept calling and calling and calling" 9-1-1, but was told "they didn't have enough officers" to respond. At 10:15 p.m., she called the victim's mother at her job and "told her she needed to come home, because someone was killing [the victim]." It took the victim's mother about ten minutes to arrive. The apartment manager began beating on the door of the victim's apartment, and the same two men left the apartment. Miller described what she saw as she entered the apartment with the victim's mother:

> The living room was all tore up, things turned over, just tore down, just demolished. Blood was everywhere. I know that. And we went into the – which would be the bedroom, but he had made that the living room. And [the victim] was laying [sic] on the floor, against the wall. And he – the only thing he told me was cover me up before I go into a coma.

Francis Hampton, the victim's mother, testified that after the two men had left, she went to the victim's apartment, entered through the unlocked front door, and found him on the floor in the back bedroom "in like a fetal position." The victim was very bloody and spoke to her, "Momma, I didn't owe them any money. I didn't owe them any money."

Officer George Bouton, of the Metro Police Department, said that he had been called to the victim's apartment to take photographs the evening of October 24, 1997, arriving at approximately 11:15 p.m. He described the apartment as being "in disarray. It appeared that there had been some type of struggle that had occurred there." He said "there was blood from the front door, pretty much throughout the apartment." We have reviewed the photographs of the apartment, which were trial exhibits, and they show smashed furniture, broken glass, blood smeared on the walls, and blood on the carpet and sofa.

Dr. John E. Gerber, a forensic pathologist, testified as to the autopsy results of the victim. He said the victim had died as the result of what were estimated to be forty-one stab wounds to the head, torso, arms, and legs. Of these, the wounds to the right lateral chest, the mid-portion of the back, and the left lateral back would have been fatal. The victim had incision wounds in addition to the forty-one stab wounds. Dr. Gerber said, "It's very likely more than one weapon was used."

By the petitioner's view of the evidence, a facilitation instruction was required because "the evidence adduced by the State would suggest only that [the petitioner] either drove, or loaned the vehicle to, [the petitioner's] brother." Additionally, he asserts that "[t]he State's sole argument against [the petitioner] was that [he] was there." We respectfully disagree with the petitioner's view of the evidence presented at trial. In brief, the State's proof was that the petitioner and his

codefendant both entered and left the victim's apartment together.[3] During the approximately thirty-minute period that they were inside, the victim was stabbed at least forty-one times, very likely with two weapons, and sustained additional uncounted incision wounds. Three of the stab wounds were fatal. The victim was thrown against the walls of his apartment and was shouting, "They're killing me." Witnesses heard the attackers asking "where their money was" and telling the victim "they were going to shoot him." Given the length of time and the savagery of the attack throughout the victim's apartment and the shouts of the victim and his assailants showing that the victim was being attacked by more than one person, we conclude that, based upon the proof presented at trial, a reasonable jury would not have determined that the petitioner was guilty merely of facilitation. In fact, the evidence was overwhelming that the petitioner actively participated in the lengthy and brutal attack on the victim. Accordingly, even if the trial court should have instructed as to facilitation, as the petitioner contends, the error was harmless and, as such, does not entitle him to post-conviction relief. Likewise, as to the variant of this claim, that appellate counsel was ineffective for not raising on appeal that the jury should have been instructed on facilitation, the record supports the determination of the post-conviction court that the petitioner failed to prove that he was prejudiced as a result. Thus, as to his claims that both the trial court and counsel erred as to a facilitation instruction not being given, we conclude that the petitioner has failed to show that he is entitled to post-conviction relief.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's dismissal of the petition.

_____
ALAN E. GLENN, JUDGE

---

[3]As we have stated, the petitioner asserted an alibi defense at trial, denying that he had been at the victim's apartment at the time of the attack.